**Virginia MODAVE, Plaintiff-Appellant,**

v.

**LONG ISLAND JEWISH MEDICAL CENTER**

and

**The County of Nassau (Meadowbrook Hospital), Defendants-Appellees.**

**No. 906, Docket 73-1470.**

United States Court of Appeals, Second Circuit.

Argued May 31, 1974.

Decided June 27, 1974.

------♦------

Bernard S. Meyer, New York City (Fink, Weinberger, Levin & Charney and Stephen P. Seligman, New York City, of counsel), for plaintiff-appellant.

Benjamin H. Siff, New York City (Bower & Gardner, Siff & Newman, Thomas R. Newman, and Richard W. Derry, New York City, of counsel), for N. Y., of counsel), for defendant-appellee County of Nassau (Meadowbrook defendant-appellee Long Island Jewish Medical Center.

ty Atty., of Nassau County, and Edward F. Asip, Deputy County Atty., Mineola, Natale C. Tedone, Senior Deputy County Atty. (Joseph Jaspan, Coun-Hospital).

Jesse J. Fine, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of the State of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), amicus curiae.

Before MOORE, FRIENDLY and MANSFIELD, Circuit Judges.

FRIENDLY, Circuit Judge:

In this case we are forced to decide questions of New York law on which, as Judge J. Skelly Wright has said with elegant understatement, "state law on the point at issue is less than immaculately clear."[1] We must do this because plaintiff, a former American Airlines stewardess living on Long Island, alleged that at the time the suit was filed she was a citizen and resident of Florida, and the defendants Long Island Jewish Medical Center (LIJ) and the County of Nassau, which operates Meadowbrook Hospital, are citizens of New York. It is unfortunate that the rights of the parties to the substantial sums at stake must be adjudicated by a court which can make only educated guesses on a close and serious issue of New York law.[2]

I.

Because of the nature of the issues, it is necessary to state the facts in some detail, although neither defendant questions the sufficiency of the evidence to support the verdict that both were guilty of malpractice.

On the night of June 8, 1968, the plaintiff, Virginia Modave, was injured in an automobile accident on the Long Island Expressway. Immediately after the accident she was taken to LIJ where she received emergency treatment.[3] She testified that, when she arrived there, she had pains in her lower neck and a "pins and needles feeling" in her fingertips, as well as other minor cuts and bruises. After a doctor examined her briefly, she was placed on a stretcher in a hall for about an hour. During that time, her neck was not immobilized, and she was not told to keep her head still. Hospital personnel then moved her into the x-ray room where she was told to "scoot over on the table." While positioning her for the x-rays, the technician twisted her neck in a manner that produced "shooting pains down my left arm, like someone put it in a light socket." After that, she said, "it became very difficult for me to move my neck."

1. Wright, The Federal Courts and the Nature and Quality of State Law, 13 Wayne L.Rev. 317, 321 (1967).

2. For other cases at this term where we have had to decide undetermined issues of New York law, see Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509 (2 Cir. 1973), and East Hampton Dewitt Corp. v. State Farm Mutual Automobile Insurance Co., 490 F.2d 1234 (2 Cir. 1973).

3. Although not of legal significance, it should be said in fairness that plaintiff's short stay at LIJ was between approximately 11:30 PM and 3 AM when the hospital was manned largely by residents and interns rather than by the full attending staff.

According to her testimony, the x-ray technician "came over several times to push my neck to get an x-ray." After the session in the x-ray room, she said her neck felt much worse; she could barely move it, and then only with great pain. She was then moved back to the hall. Again, no one immobilized her neck or told her to keep her head still. After roughly an hour, a hospital representative told Miss Modave's mother, who had arrived at the hospital, that no beds were available there, and that she should transfer to Meadowbrook Hospital. In moving her from the stretcher to the ambulance for transfer to Meadowbrook, the hospital staff again took no measures to immobilize her neck.

Upon her arrival at Meadowbrook, Miss Modave was given another set of x-rays. By then her arms were starting to ache and were becoming numb; her neck had become harder to move. The hospital placed her in a bed and put her head in a harness with a halter under her chin. She wore the harness intermittently while she was at Meadowbrook. During that time, she testified, her arms became numb, and she noticed a loss of coordination, particularly in her arms. Throughout this period, she was allowed to leave her bed on occasion. Although a doctor apparently examined her regularly, she was never treated or examined by an orthopedic or neurological specialist. After five days, she was told she could leave. She was given a sponge collar, which offered some support but did not prevent her moving her neck. When she was discharged, she said that the doctor told her, "You will have a stiff neck. Go home and take aspirin, maybe apply a little heat." She testified that she was instructed to see her family doctor if she felt that was necessary, but she was not told she should not move her neck. When she left the hospital, she testified she had no intention of returning.

For about ten days after her release from Meadowbrook, Miss Modave's condition continued to deteriorate. Finally she consulted her family physician, who directed her to an orthopedic specialist, Dr. Irving Miner. After examining her, Dr. Miner immediately placed her in Manhasset Hospital. X-rays showed a dislocation of the sixth vertebra over the seventh and a slight fracture of the body of the seventh. When traction proved unsuccessful in relieving the neck condition, Dr. Miner performed a cervical fusion on July 1, 1968. Following the operation, Miss Modave remained in the Manhasset Hospital until August 8, 1968.

Upon her release, she was required to wear a full body cast until some time in October 1968. After that was removed, she was fitted with a "four poster neck brace," which she wore continuously through December of that year. At that time Dr. Miner, who was still supervising her treatment, placed her in a conventional round collar brace. He continued to treat Miss Modave actively until June 1969, when he told her there was nothing else he could do for her, and advised her to begin a program of physiotherapy and vocational therapy. When she explained that she could not afford private facilities, he suggested that she return to Meadowbrook Hospital for the therapy. Starting on July 1, 1969, she was given physical and vocational therapy at Meadowbrook. The treatment there, which lasted until September 12, 1969, occupied three one-hour sessions per week. She was given some medication and did lifting exercises, hand exercises, and coordination drills. At the end of the two and one-half month period, she returned to her job as an airline stewardess, although she was able to work on only a limited basis. She testified that her strength and coordination deteriorated over the next year and that in August 1970 she was forced to resign.

It was during the period of her re-employment, on November 24, 1969, that Miss Modave served by registered mail the notice of claim with Nassau County which § 50-e(1) of the New York Municipal Law requires to be given "within ninety days after the claim arises." She subsequently visited specialists at the

New York University Medical Center and sought treatment in two hospitals in Florida, but her condition continued to deteriorate and she had increasing difficulties with her coordination and in walking. Since she stopped working as a stewardess for American Airlines, Miss Modave has been unemployed. One of her experts testified that she "could do some sitting work, but I would say that she would be qualified as highly disabled." Her condition, he said, was not likely to improve, and in all likelihood would gradually worsen.

On the basis of x-rays and reports of neurological tests done between the night of the accident and the date of the cervical fusion operation three weeks later, plaintiff's experts explained the probable course of her injury: In the accident, Miss Modave suffered a sharp shock to the base of the neck, which apparently resulted in a partial dislocation or subluxation in the cervical region of the spine. The dislocation might have occurred in the accident, the experts testified, or the accident may merely have torn the supporting ligaments and permitted the dislocation to occur at a later time. In either case, the experts agreed that the condition was very serious and could lead to injury to the spinal cord, resulting in nerve damage or paralysis.[4] According to one of Miss Modave's experts the reports of neurological tests given at LIJ indicated that when she arrived there, she had not yet suffered any serious injury to her spinal cord, although the cervical condition was extremely dangerous and her report of a tingling sensation in her fingers suggested that she might already have suffered some damage to the peripheral nerves. Neurological tests administered upon her arrival at Meadowbrook Hospital indicated that she had still not suffered any serious cord damage. Had she been properly treated at that point, the expert testified, she would probably have been able to make a full recovery. During the three weeks between the accident and her visit to Dr. Miner, however, her spinal condition worsened significantly—and with it the likelihood of severe spinal cord damage. By June 28, the C-6 vertebra had become more seriously displaced, which resulted in a condition known as "locked facets." The experts said this condition was much more difficult to treat than a simple subluxation. While the subluxation might have been remedied by traction at an early stage, the deterioration by June 28 required skull traction, and ultimately surgery, to stabilize the position of the vertebrae and prevent any further damage to the cord.

At trial, Miss Modave claimed that LIJ had been negligent in five respects: (1) the hospital staff improperly manipulated her neck when the nature of the injury suggested the risk of spinal damage; (2) they failed to immobilize her neck throughout her stay there; (3) they failed to take adequate x-rays; (4) they failed to diagnose her condition —a partial dislocation or subluxation of one of the lower neck vertebrae; and (5) they failed to reduce the dislocation or take other steps to prevent further injury. She contended that if LIJ had properly treated her neck condition, the subsequent injury to her spinal cord would have been lessened or would not have occurred at all.

Plaintiff's experts gave testimony that substantially supported these claims. Both suggested that LIJ was negligent in failing to appreciate the gravity of Miss Modave's condition.

---

4. While such a dislocation is not in itself disabling, it can lead to paralysis if not rectified immediately. Any serious disruption in the spinal column poses the danger of injury to the spinal cord that runs down the middle of the column. Damage to the sensitive nerve tissues in the cord may result in disability in any or all parts of the body below the neck. Since the cord tissue is non-regenerative, any disability is likely to be permanent. Abrasion or extended pressure on the cord tissue can have such severe results that good medical practice dictates that whenever there is any significant chance of such an injury, the patient's neck must not be manipulated more than is absolutely necessary, and efforts must be made to remedy, or reduce, the dislocation as quickly as possible.

Her radiologist stated that with proper procedures LIJ could have gotten x-rays that would clearly have indicated the nature of her injury and would have alerted the doctors there to the critical importance of not moving her any more than was absolutely necessary. Both experts testified that under circumstances such as those in this case, it is essential to see that the patient is not moved. Her neurologist said that instead of manipulating the patient's head while taking x-rays, the proper procedure is to position the x-ray machine in whatever manner is necessary to get the desired angles. He further testified that in such circumstances the patient should not be moved from the stretcher onto the x-ray table before her neck is immobilized. As to the manipulation of the head during the x-ray session, he commented, "That's very bad. I wouldn't even call it medical practice. It's bad." Finally, he stated that releasing her before a radiologist had read the x-rays or a diagnosis had been made was poor medical practice.

Miss Modave's malpractice case against Meadowbrook was based on six separate claims: (1) the hospital staff had failed to immobilize her head throughout the period she was there; (2) they failed to take adequate x-rays upon her arrival or correctly diagnose her condition; (3) they failed to assign specialists to treat her; (4) when the subluxation was located on June 11, no specialists in the hospital were notified of the dangerous condition; (5) the hospital staff failed to reduce the dislocation immediately or take other precautions to prevent further injury; and (6) she was improperly discharged after only five days in the hospital and was given improper instructions upon discharge. As in the case against LIJ, Miss Modave's experts gave testimony to support each of these claims. Her radiological expert said that the x-rays taken on June 9 at Meadowbrook were of a poor quality and should have been redone immediately. While subsequent x-rays successfully depicted the subluxation, he said that un-

der the circumstances, the staff member who discovered the condition should have taken steps to immobilize her and that a specialist should have been called immediately. Instead, there was no indication in the hospital records that the x-ray results were ever relayed to anyone responsible for treating Miss Modave. The intermittent use of a halter was inadequate, and permitting the patient to get out of bed to go to the bathroom undercut whatever beneficial effects the traction might have had. Finally, the expert testified that discharging the patient when the x-rays showed she had suffered a cervical dislocation was "a very bad way of handling a case."

## II.

The judge made abundantly clear to counsel that he proposed to instruct the jury that neither hospital was responsible for what the other had done; there was no objection to this. In his charge he told the jury "each claim must be considered separately. You may not lump them together." Dealing with LIJ, he said that the acts of negligence charged against it "are separate and distinct from the act of negligence charged against the County of Nassau through the Meadowbrook Hospital." He stated, with utmost clarity:

Neither hospital is responsible in any way for the acts of the other hospital. Long Island Jewish Hospital is not responsible for what happened at the Meadowbrook and the Meadowbrook is not responsible for what happened at the Long Island Jewish Hospital.

The judge instructed the jury that it could award a judgment against both defendants only if it found that both had been negligent, that the negligence of each had caused plaintiff's injury, and that it could not determine what proportion each contributed to the injury. No relevant exception was taken to these or other similar portions of the charge.

A principal defense of Nassau County was that the notice of claim was untimely since, as it alleged, the ninety day pe-

riod started to run on plaintiff's discharge from Meadowbrook on June 14, 1968. Recognizing the doctrine of Borgia v. City of New York, 12 N.Y.2d 151, 155, 237 N.Y.S.2d 319, 321, 187 N.E.2d 777, 778 (1962), that "when the course of treatment which includes the wrongful acts of omissions has run continuously and is related to the same original condition or complaint, the 'accrual' comes only at the end of the treatment," the judge treated this as raising an issue of fact and charged:[5]

> You determine whether the return to Meadowbrook for physiotherapy and for vocational training is of the same character as treatment for the original condition which plaintiff claims was caused by the County of Nassau through the Meadowbrook hospitalization during the first period, June 9th to June 14th inclusive.
>
> If you find that the treatment given this plaintiff at the Meadowbrook Hospital during the period July 1, 1969 to September 12, 1969, was a continuation of and related to the same original condition or complaint as of June 14, 1968, then you will find that the notice of claim was timely filed and you will be shortly given a form of verdict and you will see that is a specific question, and in effect asks that question. Was the notice of claim filed on November 24, 1969, timely filed? That means in time, within the ninety day period after accrual of the cause of action.
>
> If you find that the plaintiff failed to prove that second hospitalization at Meadowbrook was a continuation of the treatment and related to the origi-

nal condition or complaint, then you will mark your verdict no.

■ The jury returned verdicts of $50,000 against LIJ and of $650,000 against the County. Both moved to set the verdicts aside. The judge denied LIJ's motion, but granted the County's and directed dismissal of the complaint against it. His ground for doing this was that the concept of continuity of treatment

> necessarily includes a continuity in the type of treatment appropriate to the original injury. . . . However, where, as here, surgical intervention repairs the injury, treatment for sequela cannot be considered treatment for the original injury or for any illness related to the original injury. Proof that the disability sought to be alleviated was proximately caused by defendant's negligence is not the test under *Borgia*. If we were to accept plaintiff's argument, all a permanently disabled plaintiff need do is re-enter a hospital or re-engage the service of a physician during his or her lifetime for any treatment of the disability to extend the statute.

Plaintiff moved to reargue and also to amend the judgment against LIJ to include the $650,000 awarded against Nassau County. The judge adhered to his previous ruling with respect to the County and denied the motion to increase the judgment against LIJ. Plaintiff appeals from the judgment entered pursuant to these rulings.[6] While strongly supporting the correctness of the ruling with respect to the notice of claim,[7] Nassau County also suggests

---

5. Although counsel for Nassau County raised several minor objections both to the judge's charge and to his response to a jury question on the continuous treatment issue, the County has not claimed error in the charge on this appeal. In any event, as will later appear, we find the judge's instructions to have been in accord with current New York law.

6. In addition to contesting the judge's action in setting aside the verdict concerning the

date of accrual of plaintiff's claim, she contends that § 50–e(1) of the New York General Municipal Law violates the due process and equal protection clauses of the Fourteenth Amendment. In view of our holding that the judge was in error, we do not reach these contentions.

7. A footnote is sufficient to dispose of Nassau County's additional claim that plaintiff failed to prove she had filed the notice of claim. The complaint alleged this and the

that, should we reach the question, we should hold the $650,000 verdict to have been excessive.

### III.

■ Plaintiff's motion to amend the judgment against LIJ to include the $650,000 awarded against Nassau County takes off from the unassailable proposition of New York law "that a wrongdoer is liable for the ultimate result, though the mistake or even negligence of the physician who treated the injury may have increased the damage which would otherwise have followed from the original wrong," Milks v. McIver, 264 N.Y. 267, 270, 190 N.E. 487, 488 (1934). See ALI Restatement (Second) of Torts § 457 (1965); Prosser, Torts § 44, at 278–79 (4th ed. 1971). In Ferrara v. Galluchio, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958), the Court of Appeals applied this principle in a case where malpractice by the defendant x-ray specialists led to plaintiff's consulting a dermatologist who advised her that her radiodermatitis might develop into cancer, with consequent emotional disturbance. The Court stated that the employment of the dermatologist was "a natural consequence of the original wrongdoers' tort because the necessity for such employment was imposed upon the plaintiff by the original wrongdoers' fault." The risk of emotional injury from an alarming remark of the dermatologist, the court concluded, "must be borne by the wrongdoers who started the chain of circumstances without which the cancerophobia would not have developed," 5 N.Y.2d at 20–21, 176 N.Y. S.2d at 999, 152 N.E.2d at 252. It cannot be questioned that if the driver who caused Miss Modave's injury was negligent, he would be liable for the malpractice of both hospitals. Counsel argues that on a parity of reasoning a first malpractitioner is liable as a matter of law for the malpractice of a second; that the judge's contrary charge was

"plain and fundamental error"; and that, despite the lack of objection to the charge, the error should be corrected by imposing the $650,000 verdict against the County on top of the $50,000 verdict that the jury returned against LIJ alone.

■■ Preliminarily it is worth noting that the "plain error" phrase is found in F.R.Cr.P. 52, not in the civil rules. Except perhaps for errors that could not have been corrected on proper objection, the doctrine applicable in civil cases is the more limited one of "fundamental error," see New York.Central R. R. v. Johnson, 279 U.S. 310, 318–319, 49 S.Ct. 300, 73 L.Ed. 706 (1929)—an error so serious and flagrant that it goes to the very integrity of the trial. See United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936); Shokuwan Shimabukuro v. Higeyoski Nagayama, 78 U.S.App.D.C. 271, 140 F.2d 13, 15 (D.C.Cir.), cert. denied, 322 U.S. 832, 64 S.Ct. 1270, 88 L.Ed. 1584 (1944); McNello v. John B. Kelly, Inc., 283 F.2d 96, 102–103 (3 Cir. 1960); Ferrara v. Sheraton McAlpin Corp., 311 F.2d 294, 297–298 (2 Cir. 1962); San Antonio v. Timko, 368 F.2d 983, 986 (2 Cir. 1966).

■ Plaintiff reads the malpractice aggravation rule too broadly. It is true that a negligent driver normally is responsible for all the harm occasioned by subsequent malpractice in the course of treatment, whether the malpractice is by one hospital or by two; the driver's negligence is plainly a cause-in-fact of all the subsequent harm, and the intervening malpractice is regarded as being within the scope of the risk created by the negligent conduct. But where a third party has inflicted the original injury, the first hospital to treat the victim, even if negligent, is not necessarily responsible for any subsequent malpractice. At least where apportionment is practicable, the first hospital will be liable for subsequent damage only if its

---

answer admitted "receiving a paper purporting to be a notice of claim on or about November 24, 1969." The battle at the trial

was over the timeliness of the notice, not its receipt.

malpractice was a legal cause of the injury suffered at the hands of the second. The distinction that counsel's argument overlooks is the need to show a sufficient causal connection between LIJ's negligence and the harm inflicted by Meadowbrook.[8]

If proper handling at LIJ would have enabled Miss Modave to have been discharged on the night of the accident without need of further hospitalization and it was her maltreatment at LIJ that necessitated her hospitalization at Meadowbrook, her case against LIJ would indeed fall within the decisions of the Court of Appeals in *Milks* and *Ferrara*. But plaintiff sensibly has not pressed any such contention. Her condition was concededly serious enough to require further hospitalization, regardless of the quality of the emergency care she received at LIJ. Going a step further, when malpractice of a first hospital creates a condition not inherent in the original injury and this causes a second hospital to carry out measures which would not otherwise have been needed and which result in further harm, the first hospital might likewise be held liable. There was some evidence in this case to support a theory that the acts of malpractice at Meadow-brook would not have occurred but for the faulty handling at LIJ,[9] but absent a request to charge in accordance with such a theory, the judge quite properly refrained from submitting it to the jury on his own. The charge therefore not only did not constitute "fundamental error",[10] but in fact was not error at all.

Plaintiff's second attack on the court's charge, presented in tandem with the first, is that the judge should not have permitted the jury to apportion damages in a case in which there was no logical basis for apportioning the harm caused by each defendant. However, there was evidence to support the jury's conclusion that plaintiff's injuries were separable,[11] and in view of her failure to raise the point below it is not necessary for us to consider whether, upon request, the judge should have instructed the jury more extensively as to the limitations on their prerogative to apportion damages. In the case of an alleged error of this nature, it would be particularly inappropriate for us to consider points not raised in the trial court. Plaintiff's counsel could well have acquiesced in the instruction that was given as a matter of tactics, in the hope that separate awards against each defendant would total more than a single

---

8. A hypothetical will make this clear. A plaintiff who has suffered a stroke is brought to a hospital where he is given an overdose of medicine, which results in permanent damage to his eyesight. He is then transferred to a second hospital, which has better facilities for stroke victims. The staff of the second hospital negligently fails to recognize the seriousness of his condition, and, as a result, he suffers brain damage. Plainly the first hospital is liable only for the injury to the plaintiff's eyesight, and the second is liable only for the brain damage. If the malpractice of each had contributed substantially to the same brain injury, both would probably be liable for all the damages attributable to that injury. This, however, would be because it would be impossible for the jury rationally to apportion each tortfeasor's contribution to the single indivisible injury, not because, as counsel insists, the first hospital's malpractice automatically becomes "an original injury" as to the second hospital in any case involving successive acts of malpractice.

9. For example, a proper diagnosis at LIJ might have led to more cautious treatment at Meadowbrook. However, the causal connection between LIJ's improper diagnosis and Meadowbrook's malpractice was never clearly presented. In his case against LIJ, counsel for plaintiff focused primarily on the negligent manipulation and failure to immobilize Miss Modave's neck.

10. Even if it were, there would have to be a new trial against LIJ in which the jury would pass on the issue of causal relationship. Simple addition of the judgment rendered against Nassau County could not be justified on any view.

11. Judge Mishler thought the basis for this was that the jury could have found that LIJ's malpractice aggravated only the injury to the peripheral nerves whereas Meadowbrook caused more serious spinal cord pathology. See ALI, Restatement (Second) of Torts § 433A, comments *b*–*c*.

award for which both hospitals, one of them a charitable institution, were jointly liable.

We may indeed wonder at the jury's ability to calculate that the damage inflicted by LIJ amounted to $50,000 and the damage at Meadowbrook to $650,000. Had we been the jurors, we might well have availed ourselves of the option, accorded by the trial judge, to find apportionment impracticable and award a judgment against both parties. Compare ALI, Restatement (Second) of Torts, *supra*, § 433B, Illustration 8; Prosser, Torts, *supra*, § 52, at 313–16. But if the jurors found themselves capable of this feat, it is not for us to say them nay.

### IV.

The district judge was understandably perplexed with respect to Nassau County's claim that service of plaintiff's notice of claim on November 24, 1969, was not given within ninety days after the claim arose as required by § 50-e(1) of the New York General Municipal Law. So are we. If the decision of the Court of Appeals in Borgia v. City of New York, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962), afforded the only illumination on New York law, we would see no sufficient basis for reversing the district court's ruling that the notice was untimely. However, *Borgia* has been carried further and further in later decisions of inferior New York courts, although the appellate divisions either have rendered only brief conclusory opinions or have affirmed lower court decisions with no opinion at all. While federal courts no longer regard themselves as absolutely bound even by an apparently consistent body of decisions by intermediate state appellate courts if there is reason to believe the highest court of the state would disagree, C.I.R. v. Estate of Bosch, 387 U.S. 456, 465, 87

S.Ct. 1776, 18 L.Ed.2d 886 (1967), here we find no basis for such a belief.[12]

As earlier stated, the holding in *Borgia* was that when a course of treatment is continuous and is related to a single basic condition or complaint, the limitations period does not begin to run until the conclusion of the treatment. After stating the opposing theory that the claim accrues as soon as injury has been inflicted, Chief Judge Desmond wrote, 12 N.Y.2d at 156, 237 N.Y.S. at 321–322, 187 N.E.2d at 779:

> Little argument is needed to prove the proposition that the "continuous treatment" theory is the fair one. It would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician or hospital superintendent or by filing a notice of claim in the case of a city hospital.

A patient should not have to file a notice of claim, the court stated, "while he was still a patient receiving care and treatment related to the conditions produced by the earlier wrongful acts and omissions of defendant's employees," *id.* at 156, 237 N.Y.S.2d at 322, 187 N.E.2d at 779. In response to the dissent's suggestion that the court's broad application of the "continuous treatment" rule would substantially wipe out limitations statutes in malpractice cases, the majority noted that its holding was not to be taken to mean that "so long as a patient continues to consult the same physician for any kind of illness, the time to sue as to any kind of malpractice will never start to run." Instead, the majority stated, "[t]he 'continuous treatment' we mean is treatment for the same or related illnesses or injuries, continuing after the alleged acts of malpractice, not mere continuity of a general physician-patient relationship," *id.* at 157, 237 N.Y.S.2d at 322, 187 N.E.2d at 779.

12. It is regrettable that New York has no certification procedure like that of Florida and several other states. See Lehman Brothers v. Schein, 416 U.S. 386, 390 & n. 7, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974). Certification here would be of benefit not only to this court but to the lower New York courts as well.

The facts in *Borgia* afforded an appealing basis for an affirmative answer to the question of continuous treatment. The claim was brought on behalf of an infant who was admitted to a city hospital on October 10, 1956, to be treated for burns. Due to negligence on the part of the hospital staff, the child went into shock and suffered irreversible brain damage. For the next year and four months, the child remained in the hospital; throughout that period it received physiotherapy and other efforts of rehabilitation, all directed at ameliorating the effects of the brain injury suffered because of the hospital's malpractice. The court held that the 90-day notice period was satisfied when the infant's parents filed notice within 90 days of his release from the hospital.

The County of Nassau argues that this case falls outside the *Borgia* doctrine for four reasons: (1) there was a cessation of treatment at Meadowbrook, with no expectation of resumption, when Miss Modave was discharged on June 14, 1968; (2) she underwent a substantial course of treatment, including surgery and lengthy hospitalization, between the two periods when she was under Meadowbrook's care; (3) the rehabilitative care she received on her return to Meadowbrook was not related to the treatment she had received between June 9 and June 14, 1968; and (4) Meadowbrook's rehabilitative treatment was not the sort of treatment that would result in cure but was merely an effort to alleviate the *sequelae* of her original injury.

 The third and fourth points are answered by *Borgia* itself. The treatment afforded the Borgia infant was purely rehabilitative and was administered well after it had become clear that the brain damage he had suffered was irreversible. The purpose of the treatment was to enable him to cope more easily with the disability.[13] Moreover, the Borgia child was treated for the injury that resulted from the malpractice, not for the burns that had originally brought him to the hospital. Apparently, as long as the treatment is intended to remedy or relieve either the original injury or the effects of the malpractice, it is sufficiently "related to the same original condition or complaint" to fall within the *Borgia* test. Thus, if Miss Modave had remained in the exclusive care of Meadowbrook Hospital throughout, even as an out-patient receiving only rehabilitative treatment, her claim would fall squarely under *Borgia*. However, the County of Nassau emphasizes that when she was discharged from Meadowbrook she had no intention of returning for treatment of any kind, and that in the year between her discharge and the resumption of her treatment at Meadowbrook she was under the care of a private physician. Since those two elements were not present in the *Borgia* case and the New York Court of Appeals has said nothing more about the continuous treatment doctrine, it is necessary to examine lower court decisions to try to guess how the New York courts would have disposed of this case.

In four post-*Borgia* cases dealing with interrupted treatment, the courts have suggested that even when treatment has terminated but has subsequently resumed at the same hospital, it may still be regarded as "continuous." The Supreme Court for New York County held in Armstrong v. City of New York, 39 Misc.2d 445, 240 N.Y.S.2d 663 (Sup.Ct. 1963), that when an infant was released from a city hospital on April 30 and taken back on May 6, still suffering from the same complaint, the treatment was continuous, although on the second visit to the hospital the infant remained less than a day, and there was no indication that the child's parents had any intention of returning to the hospital at the time of the first discharge. It was ap-

13. The statement in O'Laughlin v. Salamanca Hosp. Dist. Auth., 36 A.D.2d 51, 319 N.Y.S. 2d 128, 130 (4th Dep't 1971), that in order to delay the accrual date "the continuing treatment must be of the same character as that giving rise to the cause of action" would thus appear to read *Borgia* too narrowly.

parently enough that the basic pathology being treated remained the same and that the period of time between the two admissions was not unreasonably long.

The First Department in Gnoj v. City of New York, 29 A.D.2d 404, 288 N.Y.S. 2d 368 (1st Dep't 1968), ruled that the question whether treatment is continuous under the *Borgia* rule is primarily a factual issue to be resolved by the jury. In *Gnoj*, the plaintiff was admitted to Bellevue Hospital in 1958, suffering from renal tuberculosis. The hospital, however, did not correctly diagnose his condition at that time, and there were subsequent discharges and admissions until July 1961, when the correct diagnosis was finally made. The plaintiff remained in the hospital from that time until December 1962. He filed his notice of claim against the city within 90 days of his release. The court noted perfunctorily that the "timeliness of the notice of claim rests on the continuity of plaintiff's treatment for his physical condition which arose in 1958 and continued thereafter until his last treatment in December, 1962, which is a jury question," 29 A.D.2d at 405, 288 N.Y.S. 2d at 369. Although the *Gnoj* court provided no guidelines for determining when the question of continuous treatment would be so clear that it would have to be taken from the jury and decided as a matter of law, the court's brief statement suggests that the jury would be given wide latitude.

In Wear v. State, 59 Misc.2d 485, 299 N.Y.S.2d 469 (Ct.Claims 1968), modified, 33 A.D.2d 886, 307 N.Y.S.2d 588 (4th Dep't 1969), the wife of a malpractice victim sought recovery for loss of consortium. The victim was a patient at a state hospital between July 2 and September 21, 1966, during which time, the plaintiff alleged, the hospital staff was guilty of malpractice which caused the patient speech and voice difficulties. He returned to the state hospital on December 23, 1966, for an examination and speech evaluation; subsequently he was given speech therapy treatments at the hospital which continued until March 8, 1967. On the basis of the moving papers, the Court of Claims held that the treatment extended to the date the speech therapy program was terminated, and that the plaintiff's subsequent motion for late filing was therefore timely. On appeal, the Appellate Division held that the affidavits submitted in the case were insufficient to indicate whether the course of treatment terminated on September 21, the date of discharge from the hospital; December 8, the date the victim was examined at the hospital; or March 8, the date his speech therapy sessions were concluded. Accordingly, the court amended the Court of Claims' judgment to provide that the question of timeliness could be raised again "when the real situation is disclosed upon the trial," 33 A.D.2d at 887, 307 N.Y.S.2d at 589. Unfortunately, the Appellate Division did not indicate in what way the affidavits were deficient to form a basis for ruling on the limitations claim. Thus, the most that can be garnered from *Wear* is that when a patient is discharged from a hospital and subsequently given rehabilitative treatment related to the alleged malpractice, the facts may permit a finding that the treatment was continuous.

Finally, the plaintiff relies on Quinones v. City of New York, an unreported decision of the Supreme Court of Kings County, which was affirmed without opinion, 37 A.D.2d 1049, 327 N.Y.S. 2d 600 (2nd Dep't 1971). In *Quinones*, the plaintiff was treated at a city hospital for an ankle fracture in 1964. He left the hospital in February of that year but continued to receive orthopedic treatment there until June, when he was discharged with a notation that "he had received maximum benefits from the physical medicine and rehabilitation." Nineteen months later he returned to the hospital complaining of ankle pains. He was admitted for a second operation in January 1966 and a third in May of that year. After yet another admission in August, he was discharged for the last time in September 1966. Thereaf-

ter, he continued to receive rehabilitative treatment at the hospital's orthopedic clinic. In spite of the numerous admissions and discharges and a nineteen-month gap between his 1964 discharge and his readmission in January 1966, the trial court held that the course of plaintiff's treatment did not terminate at any point between 1964 and his last visit to the hospital's rehabilitation clinic in early 1967. The court held that the "continuous treatment" meant "treatment which is not interrupted or broken by professional treatment solely for an unrelated injury or by the lapse of an unreasonable period of time." It was not necessary, the court wrote, that the treatment be administered daily, or even on a regular basis. The nineteen-month gap in treatment, the court pointed out, "did not destroy the continuity of his disability which stemmed from the initial treatment of the injury."

■ Despite the absence of a fully explicated statement from any Appellate Division, these four cases hold at least that discharge from a hospital and the consequent occurrence of a period when it would no longer "be absurd to require a wronged patient" to serve a summons or file a notice of claim do not necessarily terminate a course of treatment. They suggest, moreover, that the question whether the interruption is sufficient to vitiate the continuousness of the treatment should be left primarily for the jury. As indicated, the jury in this case was instructed at some length about the "continuous treatment" issue. Inasmuch as the interval between the two sessions was not unreasonable in light of the serious nature of plaintiff's injury, and since rehabilitative care was indicated as the next proper step in an effort to treat a condition that originated in the accident and the hospitalization shortly thereafter, the interruption in treatment at Meadowbrook is well within what the four cited cases permit.

■ The County's final argument is that the intervention of private medical care automatically terminates the treatment for purposes of the "continuous treatment" doctrine. This argument, however, runs afoul of Capuano v. Jacobs, 33 A.D.2d 743, 305 N.Y.S.2d 837 (1st Dep't 1969), aff'd without opinion, 27 N.Y.2d 776, 315 N.Y.S.2d 306, 263 N.E.2d 670 (1970). In a brief per curiam opinion, the Appellate Division for the First Department there upheld a jury determination that the plaintiff's treatment had been continuous. The plaintiff had been admitted to the defendant hospital in 1961, at which time the hospital had negligently failed to discover a kidney stone. The facts brought out by the two dissenting judges indicate that the plaintiff was "discharged to the care of a private physician" in April 1961, after which she remained under the independent doctor's care. She returned to the hospital for further treatment in June 1961 and was subsequently admitted for an operation to remove the kidney stone in July 1962. While it is possible to distinguish *Capuano* on the ground that the failure to discover the kidney stone is a form of omission that should never start the running of a limitations period, it appears from the brief opinion that the majority of the Appellate Division instead relied exclusively on the "continuous treatment" rule. Moreover, under New York precedents, the limitations period is not tolled simply because of a negligent omission such as a failure to make a correct diagnosis, see Schiffman v. Hospital for Joint Diseases, 36 A.D.2d 31, 319 N.Y.S.2d 674 (2nd Dep't 1971). The County's attempt to distinguish *Capuano* on the ground that there the plaintiff was treated for the same malady that had originally been misdiagnosed runs counter to the four cases already discussed, which indicate that rehabilitation, even to relieve the effects of malpractice, can constitute treatment. Moreover, Dr. Miner, the defendant's witness, testified that at the time Miss Modave began the rehabilitation treatment at Meadowbrook, she was suffering from "the same basic pathology" that had required the July 1, 1968, operation. The vertibral problem, it is true,

had been stabilized. But the nerve problem—the real source of complaint throughout—was still causing her distress, and was at least thought to be amenable to further treatment.[14]

Our decision in Kossick v. United States, 330 F.2d 933 (2 Cir.), cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed. 2d 44 (1964), relied on by the County, does not provide it with real support. In *Kossick* the plaintiff, a seaman, suffered a serious injury in 1950, while in the care of the United States Public Health Service. After a series of treatments involving lengthy hospitalization and surgery, he was discharged as "fit for duty" in November 1952. In the face of the two-year statute of limitations in the Federal Tort Claims Act, 28 U.S.C. § 2401(b), he brought suit against the United States for malpractice in April 1963. To excuse his delay, he relied on the continuous treatment doctrine that had recently been announced by the New York Court of Appeals in *Borgia*. Considering the issue to be one of federal law, we held that adoption of the continuous treatment rule in Federal Tort Claims Act cases would have delayed the time of accrual of the cause of action at the most until Kossick's discharge in November 1952, when nothing more in the way of a remedy could have been accomplished. "It would have been unreasonable," we wrote, "to postpone the beginning of the limitation period so long as Kossick exercised his statutory right to demand further treatment at the Hospital . . . . a period that will never expire so long as he is a seaman," 330 F. 2d at 936. In dictum, we added that we had serious doubt that the New York courts would reach a different result on the facts of that case. Kossick's last visit to the hospital was outside the limitations period, and his visits to Public

Health Service outlets after that time were for ailments unrelated to the malpractice.

We concede that this case poses peculiar theoretical difficulties in applying the continuous treatment rule, since Miss Modave's condition does not fit the ordinary pattern in which a patient is treated and cured, or even the alternative in which treatment fails to effect a cure but the patient's condition is ultimately stabilized. Apparently Miss Modave will never wholly recover, and she may well require further treatment in an effort to prevent deterioration of her condition. In cases like this, the beginning of the limitations period could thus be extended almost indefinitely. However, there are several means the New York courts could employ to minimize the danger. Presumably, if the patient had returned to the original doctor or hospital simply as a ruse to escape the limitations bar, the "treatment" would be disregarded as not bona fide. But this is not claimed to have been the situation here. Going further, the courts could limit the kind of treatment that would be deemed "continuous" to treatment directed at amelioration rather than long-term treatment intended merely to protect against recurrences or further deterioration. Since the apparent purpose of Miss Modave's return to Meadowbrook was to prepare her, if possible, to return to her job with American Airlines, which she did at the end of the treatment period, the physiotherapy at Meadowbrook would qualify under this test. If these two steps should not be deemed sufficient, the Court of Appeals could rule that a break in the chain of treatment will cause a recognition of accrual if before or during the break the plaintiff has discovered or reasonably should have discovered the

---

14. On the same reasoning, we disagree with Judge Mishler's conclusion that the July 1, 1968, surgery "was the complete treatment for the injury initially incurred by plaintiff and aggravated through Meadowbrook's malpractice." The surgery stabilized the cervi-

cal condition, but during the following months treatment was necessary both to ensure that the cervical fusion remained intact and to attempt to restore functions whose impairment was directly attributable to the spinal cord trauma.

malpractice.[15] Compare Prosser, Torts § 30, at 144–45 (4th ed. 1971). While the New York courts have shown no taste for adopting the "discovery" test as the sole determinant of the time of accrual of a malpractice cause of action except in "foreign object" cases, see Schwartz v. Heyden Newport Chemical Co., 12 N.Y.2d 212, 237 N.Y.S.2d 714, 188 N.E.2d 142, cert. denied, 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032 (1963); Flanagan v. Mount Eden General Hospital, 24 N.Y.2d 427, 301 N.Y.S. 2d 23, 248 N.E.2d 871 (1969),[16] this might provide a useful limiting device in the continuous treatment context by preventing expansion of the doctrine to the point where the salutary purposes of the statute of limitations are frustrated. However desirable we may think such an emendation would be, we simply have no basis for saying that the Court of Appeals would agree.

Taking the New York cases as they are, we conclude that there was sufficient evidence for the jury to find continuous treatment in this case despite a substantial gap between the malpractice and the rehabilitative treatment and the intervening private medical care and that it was error for the judge to have set its verdict aside. Dubieties of the sort here discussed are part of the high price paid for diversity jurisdiction.

## V.

 Two other points raised by Nassau County merit only brief comment.

After setting forth plaintiff's claims to medical special damages of some $13,000, past loss of earnings of some $19,000, future loss of earnings, past and prospective pain and suffering, and loss of enjoyment of life, plaintiff's trial counsel suggested that fair and just compensation "should be in the neighborhood between $850,000 and $900,000," then adding "[b]ut I leave that up to your good common sense and conscience and justice." The County complains that this portion of counsel's summation was inflammatory. However, we held long ago that "counsel has a clear right to state what the plaintiff asks and expects to recover for his injuries." Philadelphia & Reading Ry. v. Skerman, 247 F. 269, 271 (2 Cir. 1917). And counsel's remark was a great deal less provocative than the price list which we recently held not to constitute fundamental error, although we suggested that, in the future, trial judges should give an appropriate caution even if not requested. Mileski v. Long Island R.R., 499 F.2d 1169, 1174 (2 Cir. 1974). Here Judge Mishler was not asked to instruct the jury that counsel's remark was simply argument and not evidence. We are confident that he would have done so if asked.

 In light of his ruling that plaintiff's notice of claim was untimely as a matter of law, the trial judge did not reach the County's contention that the verdict against it was excessive. Although the refusal of a trial judge to set aside a verdict for excessiveness unless

15. Several jurisdictions have adopted an even stronger limitation on the continuous treatment rule, namely, that the cause of action accrues when the malpractice was or should have been discovered, even though the treatment is continuous in the dictionary sense, see Petrucci v. Heidenreich, 43 Cal.App.2d 561, 111 P.2d 421 (1941); Waldman v. Rohrbaugh, 241 Md. 137, 215 A.2d 825 (1966); Tortorello v. Reinfeld, 6 N.J. 58, 77 A.2d 240 (1950); Swang v. Hauser, 288 Minn. 306, 180 N.W.2d 187 (1970); Koenig v. Group Health Cooperative, 5 Wash.App. 836, 491 P.2d 702 (1971).

16. The New York courts have extended the rule tolling accrual in malpractice cases until

discovery to a case involving injury to an internal organ occurring during surgery, Dobbins v. Clifford, 39 A.D.2d 1, 330 N.Y.S.2d 743 (4th Dep't 1972), and to one in which a prosthesis unexpectedly broke after its insertion in the patient's hip, Murphy v. St. Charles Hospital, 35 A.D.2d 64, 312 N. Y.S.2d 978 (2d Dep't 1970). In spite of these minor erosions, there are no signs that the New York courts are ready to adopt the "discovery" rule for malpractice cases in general, see Schiffman v. Hospital for Joint Diseases, supra, although it has been adopted in one form or another in more than twenty states, see Hamey, Medical Malpractice 267–68 (1973); Annot. 80 A.L.R.2d 368 (1961 & Supp.).

the plaintiff consents to a remittitur is not beyond appellate scrutiny, Grunenthal v. Long Island R.R., 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968); Dagnello v. Long Island R.R., 289 F.2d 797 (2 Cir. 1961), the question should be ruled on in the first instance by the trial judge. This is especially important in a case like this where the trial judge had an opportunity to observe the plaintiff and heard many days of testimony concerning the pain and suffering incident to her hospitalization and the effect of the malpractice on her future.

The judgment with respect to LIJ is affirmed, with costs to LIJ. The judgment dismissing the complaint against the County of Nassau is reversed with costs to the plaintiff, but before entering judgment thereon to hear and pass upon the motion of the County of Nassau to set aside the verdict as excessive.